## Case of MILLER'S Estate.

.APPEAL.

The execution of a disputed specialty is fully proved by the production of the subscribing witnesses, who recognize their signatures, and remember the transaction, though neither remembers any formal delivery, and the positive evidence of another person present at the time. A failure of memory, on the part of the subscribers, is sufficient ground for introducing the other testimony.

*M.* a native of *P.* after an absence of seventeen years in *S. A.* returned to the *U. S.* with no purpose of resuming his foreign residence. He resided with his father; styled himself in an instrument as of *P.* and made a new contract for another foreign residence in *A.* for a limited time. *Held*, that the domicil of origin was revived: and that the new absence for a special and temporary purpose, and without a view of indefinite residence, effected no change.

If a foreigner asks for a dividend of a decedent's estate, he must take it subject to the priorities, established by the law of the forum. *Qu.* If the assets had been taken away from the foreigner's own country by an irregular removal?

THIS was an appeal from the decree of the Orphan's Court of the city and county of *Philadelphia*, rendered on the 18th of *January*, 1828.

*William G. Miller*, of *Philadelphia*, left the *United States*, about the year 1805, being then twenty-two years of age, and did not return until 1822. In the mean while he was engaged in commercial enterprises, and contracted large debts as a member of a mercantile house in *Buenos Ayres* and *Monte Video*. His residence at *Buenos Ayres* was about eight years, during part of which time he kept house. He lived three or four years at *Monte Video*, and exercised there the functions of Vice-Consul of the *United States*. His last articles of partnership were for three years, with notice to dissolve. Thirteen months of that term were still to elapse, when *Miller* came to *Philadelphia* in 1822, for the purpose of dissolving certain foreign attachments, and, if necessary, of taking the benefit of the insolvent laws. He was also employed here in soliciting consignments for the *South American* house; but he gave the partners notice of his resolution to quit the firm at the expiration of the time stipulated, and expressed his intention of residing here and engaging in business. *Miller* lived at his father's house, except the time spent in journies to the eastward and to *Washington*. He was not known to have voted during this period, or paid a tax, or served upon a jury.

In the summer of 1824, *Miller* entered into a negociation with *Borie* and *Laguerenne* on the subject of a partnership to be formed for carrying on a commission business in *Alvarado* in *Mexico*. A partnership was agreed upon to last five years, with liberty for either

· (Case of Miller's Estate.)

party to dissolve it at the end of three years. In the articles *Miller* styled himself " of *Philadelphia.*" He expressed great reluctance to go on account of the climate and the bad state of his health; and he was anxious to limit the necessary time of his stay. In four or five months after his arrival at *Alvarado, Miller* died. He kept house during his residence at that port.

Letters of administration were taken out to the estate of the deceased, by his brother, *Clements S. Miller,* in *Philadelphia.* The funds, that came to his hands and were in court for distribution, arose from the profits of the house at *Alvarado* after payment of all demands there. They were transmitted by the surviving partners upon a settlement after the intestate's death. The whole balance was two thousand eight hundred and ninety-five dollars, forty-four cents; it was claimed by simple contract creditors domiciliated in foreign countries, whose demands amounted to one hundred and thirty-nine thousand six hundred and fifteen dollars, sixty-four cents, and by the assignees of *Abraham Piesch,* who contended for a preference as specialty creditors to the amount of ten thousand one hundred and twenty-one dollars, under the following circumstances:

When *Miller* had completed his arrangement with *Borie* and *Laguerenne,* he became anxious to effect a settlement of a debt due to the assignees of *Abraham Piesch,* in order to prevent impediments to his business. He obtained a letter of license, for which he gave a sealed acknowledgment of the debt. The sealing of this instrument was not stated in its body; the party declared himself only to have " set his hand." The subscribing witnesses swore to their own signatures, but did not recollect any signing, sealing, or delivery by the party. They were unacquainted with *Miller*'s person and handwriting. *John Greiner,* one of *Piesch*'s assignees, having released his commissions, was thereupon sworn. He deposed, that he had himself affixed the seal by agreement with Mr. *Miller,* and that the instrument was afterwards acknowledged in the presence of the subscribing witnesses.

. The Orphan's Court, on the 18th of *January,* 1828, decreed the instrument to be a specialty; and that the entire assets, being distributable by our laws, should be paid over to the assignees of *Peisch* under the fourteenth section of the act of 19th *April,* 1794.

The appeal of the simplé contract creditors from this decree was argued upon the following exceptions:—

1. That the said court erred in decreeing the instrument, produced by the assignees of *Abraham Piesch,* to be a specialty: no sufficient evidence of the same having been laid before the court.

2. That the said court erred in decreeing the said assets to be distributed according to the laws of *Pennsylvania:* the said *William G. Miller* not having been domiciliated in this state at the time of his decease.

3. That the said court erred in decreeing the said assets to be

(Case of Miller's Estate.)

distributed according to the laws of *Pennsylvania,* inasmuch as the said intestate died in *Mexico,* and out of the territory of this state.

*Laussat,* for the appellants:—I. The execution of the instrument as a specialty was not shown.    The party, producing a specialty, is bound to prove, 1. the identity of the person executing; 2. sealing; 3. delivery: and the subscribing witnesses are to substantiate the transaction, for they were chosen by the parties for that special purpose.    Here, the subscribing witnesses fail wholly in proving *Miller's* identity, and give inadequate testimony on the subject of sealing and delivery.

As to the admission of *Greiner* to supply their deficiencies, it was erroneous and improper, because as no one of the special exceptions, stated in the books, was presented to the court, the general rule applied, which confines evidence to the subscribing witnesses.    (*U. S. Bank* v. *Dandridge,* 12 *Wheat.* 91.    *Starkie's Ev. Part* 2. 332.    *Lesher's Lessee* v. *Levan,* 2 *Dall.* 96.    *Sigfried* v. *Levan,* 6 *Serg. & Rawle,* 311, 12. 1 *Phill. Ev.* 419 to 421.)    There is then no direct evidence to establish this alleged specialty ; and it goes, therefore, to the court as it would to a jury, merely upon presumptions, which are entitled to no favour against that equality among creditors, which is the only true equity.    Upon *non est factum,* the courts go far to support an instrument, for justice requires it; but here the situation of things is reversed, and every consideration pleads in favour of the appellants.

II.  The act of 1794, § 1. 14. (3 *Sm. L.* 143.) establishes its preferences only where the decedent was *within the state* at the time of his or her decease.    Giving this expression the utmost latitude, it cannot be made to embrace more than those who had at least their *domicils* here.    The domicil of *William G. Miller* is therefore an important subject of inquiry.

Domicil is a habitation fixed in a particular place, without a present intention of removal.    (10 *Mass. Rep.* 488.    *Case of the Venus,* 8 *Cranch,* 278.)    It is compounded of habitation and intention. Every man's first domicil is the *domicilium originis,* his place of birth; and this adheres to him, until another is acquired by his own act.    *Miller's* first domicil was therefore in *Philadelphia,* and it so continued until divested by the unlimited residence at *Monte Video.* His return to *Philadelphia* was only for special purposes; he did no act, exhibiting any fixed intention of residence, but on the contrary, he very early accepted a commercial proposition, which involved a new absence from the country, in *Alvarado.*    The most that can be conceded is, that *Miller* had a *future* intention to resume his domicil here, not that it was actually so resumed.    It was an ambulatory intention uncoupled with habitation.    (*Bruce* v. *Bruce,* 2 *Bos. & P.* 230, *note.*) Whether he acquired a new domicil at *Alvarado* or continued to preserve the domicil of *Monte Video,* is indifferent to the present argument.    Either position would equally show error in the decree of the court below directing distribution by our state statutes.    He kept

(Case of Miller's Estate.)

house in *Alvarado*, which constituted *habitation*, and there was no settled limit to his stay: besides where a man *dies*, there is *prima facie* his domicil. (2 *Bos. & P.* 230, *note*.)

III. But the act of 1794, § 14, extends only to persons dying *within the state*, and is a legislative recognition and extension of the principle, that "*mobilia personam sequuntur, immobilia situm.*" Domicil is, therefore, unimportant; and as personalty can have no *situs*, but is considered to accompany the person of its owner, the distribution is thus drawn to the place of the decease. In our case, the adoption of the law of the present *situs* would be particularly inequitable; the property has been drawn away from *Alvarado*, and brought here by administration, when it is understood, that the law of the former country gives no preference to specialties. If any *situs* is to govern, it ought to be that in which the property was first found; and this court may decree distribution according to the law of such foreign country. (*Harvey* v. *Richards*, 1 *Mason*, 411.)

*Miller*, for the appellees:—The subscribing witnesses have proved enough to sustain the instrument as a specialty. (*Pigott* v. *Holloway*, 1 *Binn.* 436. *Long* v. *Ramsay*, 1 *Serg. & Rawle*, 72.) And even if they had not, the testimony of *Greiner* was admissible, because the subscribing witnesses, when produced, were unable to declare the truth. (*Taylor* v. *Meekly*, 4 *Yeates*, 79. *Lowe* v. *Joliffe*, 1 *Bl. Rep.* 365. *Ley* v. *Ballard*, 3 *Esp.* 173, *note*. *Grellier* v. *Neal*, *Peake's N. P. Rep.* 198. 1 *Phill.* 363. 419, 420. 1 *Stark*. 335, 6.) As to the *solemnity* of this instrument, it comes within the rule of *Taylor* v. *Glaser*. (2 *Serg. & Rawle*, 504.)

Domicil depends upon the intention of the party to make a permanent residence. (2 *Kent's Comm.* 348.) The object of all rules is to supply the want of explicit declarations. (*Guier* v. *O'Daniel*, 1 *Binn* 352, *note*. *Bruce* v. *Bruce*, 2 *Bos. & P.* 229, *note*. *Somerville* v. *Somerville*, 5 *Ves. jr.* 787.) In *Miller's* commission as consul, he is styled " of *Pennsylvania;*" and in his articles of partnership with the house at *Alvarado*, he is said to be " of *Philadelphia*." Domicil is defined to be " a settlement in a particular place with the intention of always staying there." (*Denisart*, tit. *Domicile*, 1. 7. 18, 19. 2 *Domat.* p. 486. *b*. 1. *tit.* 16. § 3. p. 5. *Pothier, Costumes d' Orleans*, c. 1. n. 8, 9. *Voet, Pandect, lib.* 5. *tit.* 1. 92. 97. *Monroe* v. *Douglass*, 5 *Madd. Ch. R.* 379.) The *domicilium originis* may be changed by certain acts of the party: (*Henry on Foreign Law, App'x.* 196, citing the opinion of *Grotius.*) but upon the abandonment of the acquired domicil, that of origin reverts; and so when the acquired domicil is doubtful. (*Henry* citing *Grotius, Ibid.* 196.) The domicil of origin is supposed to be every man's favourite; when he returns to it, slight grounds will restore him to it; (5 *Rob. Adm. R.* 99. *Case of the Anne Green*, 1 *Gallis.* 274, 284.) while the strongest are required to establish a *foreign* domicil. These principles apply to the circumstances attending *Miller's* return to *Philadelphia*, and fully restore him to his domicil of origin.

(Case of Miller's Estate.)

It is very doubtful, indeed, whether that domicil was ever changed. There is a great difference between a removal from one place to another in the same country, and a removal to a foreign country. A person residing in a place only for the purposes of trade, without keeping a house, does not change his domicil. (*Henry*, p. 200. *Cheyne's Case*, *Note* to 5 *Madd*. 379. *Duchess of Kingston's Case*, 1 *Collect. Jurid.* 240. *Thornton's Case*, 2 *Addams*, p. 6.) As to *Miller's* residence at *Alvarado*, it was fixed not to exceed five years, and therefore could give no domicil. (*Somerville* v. *Somerville*, 5 *Ves.* 781.)

This is the case of an *American* dead in *Mexico*, whose funds not being required by creditors there, are remitted to the place of his birth to a person legally authorised to receive them. The laws of *Mexico* have already refused the task of distribution: the assets are surrendered to *our* law, and every court ought to assert its own jurisprudence in preference to that of other countries. The business of administration here is to pay debts, as well as collect assets : (*Select Men of Boston* v. *Boylston*, 4 *Mass. Rep.* 318. 324.) and these payments must be according to our own established preferences, (*Richards* v. *Dutch*, 8 *Mass. Rep.* 506. *Dawes* v. *Boylston*, 9 *Mass. Rep.* 337. *Stephens* v. *Gaylord*, 11 *Mass. Rep.* 255. *Dawes* v. *Head*, 3 *Pick.* 128. 2 *Kent's Comm.* 348.) for the right of priority depends upon the place of administration. (*Harrison* v. *Sterry*, 5 *Cranch*, 299. *Smith* v. *Union Bank*, 5 *Peters' Rep.* 518.) That comity, which gives effect to foreign laws, is not to be admitted against the fundamental institutions of a country. (*Desesbats* v. *Berquier*, 1 *Binn.* 344.

*C. J. Ingersoll*, in reply :—This is a court of equity, sitting upon an appeal from a court of equity.

1. As to the alleged specialty, it must be borne in mind, that the court, wherever they can, are to create equitable assets, in order to produce equality of distribution. (*Moses* v. *Murgatroyd*, 1 *John. C. R.* 130.) In this case the property was situated in a country making no preferences, when the defendant took out administration upon nothing, and paid a commission of fifteen per centum out of the estate, for drawing the funds within the reach of our law. The want of equity in the distinction between specialties and simple contracts is acknowledged. (*Humphreys on Real Prop.* 264. 334.) At all events, the superiority of a deed arises from its solemnity and deliberation, and not from mere manipulation. (*Plowd.* 308. *Fell on Guar.* 2.) *Miller* appears not to have known the value of a deed, and acted without deliberation.

It is also a most valuable and important rule, that where there are subscribing witnesses, they alone should be called, except in specified exceptions. (*U. S. Bank* v. *Dandridge*, 12 *Wheat.* 91. *Sigfried* v. *Levan*, 6 *Serg. & Rawle*, 311. *Steel* v. *Tuttle*, 15 *Serg. & Rawle*, 210. *Cowden* v. *Reynolds*, 12 *Serg. & Rawle*, 283. *Chess* v. *Chess*,

(Case of Miller's Estate.)

1 *Penn. Rep.* 43.) The mere circumstance of forgetfulness in the subscribing witnesses is no reason for introducing other testimony. (*Appleton* v. *Bead*, 18 *Serg. & Lowb.* 219.   *Pitt* v. *Griffith*, 17 *Serg. & Lowb.* 56.)   *Taylor* v. *Meekly* (4 Yeates, 79.) went upon the distinct ground, that the obligor and the subscribing witnesses were not present together.   If in this case the evidence is confined to the subscribing witnesses, the specialty is not established, and the whole becomes equitable assets to be distributed *pro rata.*

2. As to the law of the distribution, moveables must be guided by the law of the person, immoveables by the law of the place.   There can be no doubt of *Miller*'s domicil at *Monte Video.*   But taking our own act of assembly as the law, it wholly fails the appellee.   In the first and fourteenth sections, which confer the power to grant letters of administration, and create the rule of preferences, the only cases contemplated are those of persons dying within the commonwealth. The court will not strain the law to create inequality among creditors.

The funds here stand before the court as if they were at *Alvarado*, because they were improperly and unnecessarily brought thence by the administrator.   They are, therefore, to be distributed according to equity, because we have no law, which provides for preferences in such funds. *Harvey* v. *Richards*, 1 *Mason*, 408, *Milne* v. *Moreton*, 6 *Binn.* 353. *Topham* v. *Chapman*, 1 *Const. Rep. S. C.* 292. *Holmes* v. *Remsen*, 20 *Johns. Rep.* 265. *Dawes* v. *Head*, 3 *Pick.* 128, are all either cases of foreign attachments, or of funds regularly and properly brought within the court's jurisdiction.

The opinion of the court was delivered by

GIBSON, C. J.—The execution of the disputed specialty is established by plenary proof.   Did it stand on the testimony of but the subscribing witnesses, it would still be sufficiently made out.   Both recognise their signatures, and both remember the transaction; but neither remembers the fact of a formal delivery.   Nothing is clearer, however, than that a formal delivery is not indispensible.   The leaving of a deed on the table for the grantee to take it away, has been held sufficient.   Here the instrument is proved by one of the subscribing witnesses, to have been laid on the counter; which, in connexion with the fact that it is produced by the party who claims under it, is enough in all reason to warrant a presumption of its delivery; and this on the ground of all presumptions—the usual course of such transactions.   In a vast majority of cases, the deed is merely left for the grantee to take it away, and where it is produced by him, the law, in the absence of proof to the contrary, infers a delivery, for the reason, that in the absence of countervailing proof, it presumes against fraud and in favour of innocence.   So strong is this presumption, that in the case of a second marriage within a year after the husband had left the country, it has been allowed to prevail over the usual presumption of continuance in life. *Starkie's Ev. Pt.* IV. 1248.

(*Case of Miller's Estate.*)

It is therefore natural and reasonable to presume, that the grantee producing, as he does here, an instrument, which is proved to have been signed, sealed, and left on the counter with no view, that appears, to a postponement of the delivery, obtained the possession of it with the assent of the grantor rather than surreptitiously. It is by force of the same presumption, that proof of the hand-writing of subscribing witnesses, who are dead or cannot be had, is *prima facie* evidence of execution. And such presumption accords not only with the current of such transactions, but with the recollection, as far as it goes, of the subscribing witnesses here, both of whom say, in effect, that unless the deed had been delivered, they would not have subscribed it as witnesses of the fact. Of what effect then is it, that the parties have omitted the usual recital of having affixed the seal? That recital is by no means essential to the validity of a deed, nor does it bear even remotely on the disputed fact of delivery ; and as evidence of intention, it is certainly less operative than the customary memorandum of the execution subscribed by the witnesses, to which any recital or declaration of the parties themselves is inferior, just as proof of their hand-writing is inferior. But in addition to the testimony of the subscribing witnesses, we have that of one of the assignees, having released any beneficial interest which he might be supposed to have in the trust, who proves the admission of the assignor at the time of sealing, that the instrument was then his deed, of which delivery was certainly a constituent part. The objection to the competency of this witness on the alleged ground, that none but a subscribing witness, where there is one, can be heard, is destitute of the shadow of an argument. The testimony of the subscribing witnesses, where it is attainable, must be had in the first instance, as it has been here ; but the law is not so unreasonable as to declare, that the grantee must lose his right wherever they have lost their memory. The title to priority in the case before us, then, depends not on the proof of the instrument, but on the solution of a question, whether administration is to be made according to the law of the domicil or of the *situs rei* at the time of the intestate's death ; and that involves a prelimary inquiry as to the true place of his domicil.

The facts are, that being a native of *Philadelphia,* and having been absent from the *United States* for seventeen years, he returned on the business of a commercial house at *Buenos Ayres* and *Monte Video,* of which he was a partner, but with no purpose of resuming his foreign residence. He resided with his father's family here for two years, during which his connexion with the house in *South America,* was dissolved by efflux of time, and a partnership formed between him and other persons, for the establishment of a house at *Alvarado* in *Mexico.* In consequence of the apprehended insalubrity of the climate, he manifested in the course of the negociation, that led to this arrangement, an insuperable aversion to being bound for more than two years, and the articles of co-partnership, in which, it is worthy of remark, he was designated as being of *Philadelphia,* were

(Case of Miller's Estate.)

framed accordingly; and though he did not speak particularly of returning, he expressed a determination not to go abroad again after that time. It satisfactorily appears, therefore, that whatever was the character of his residence in *South America,* his domicil there, if he had acquired one, was relinquished at his return to *Philadelphia;* and it will not be disputed, that his domicil of origin, which was at most but suspended, was instantly revived by his resumption of the character of an *American* citizen—even before the dissolution of his connexion with the foreign house. For an acquired character depending, as it does, not on the existence of commercial relations, but actual residence without a present purpose of terminating or abridging it, is abandoned for every purpose of legal effect, the instant a step is taken to abandon the country. It is clear, then, that when the intestate returned to *Philadelphia* with a view to a residence of indefinite duration, he regained his original domicil; and it is just as clear he did not part with it again by going to *Mexico.* That he went there for a special and temporary purpose, and without a view to make it a place of indefinite residence, is an indisputable result of the evidence. We have, then, the case of an administrator, who claims to administer, according to the law of the domicil, assets transmitted to him by a surviving partner of the intestate, and among creditors, who were not resident, at the time of the death, in the country where the assets were.

The ground on which the assets are to be collected by the authority, and administered according to the law of the country, in which they happen to be at the decedent's death, is the claim which its citizens have to the protection and assistance of the government in the prosecution of their rights. This protective principle has never been relaxed by the *American* courts; and was particularly maintained by this court in *Mothland* v. *Wireman,* at the last term at *Chambersburg.* But when the purposes of protection and assistance have been answered, or there are in fact no resident creditors to be protected, it seems from the case of *Dawes* v. *Head,* (3 *Pickering,* 128.) that the proper course is to transmit the assets to the administrator at the place of the domicil for further administration among the other creditors and those entitled to the succession. Perhaps a more regular course than the one pursued in the case at bar, would have been to obtain administration of the assets in *Mexico,* for the purpose of transmitting them to the administrator here. If, however, there were in fact no *Mexican* creditors, as is probable from the very nature of the case, the joint debts being payable before the intestate's interest could be separated from the partnership, the necessity of an ancillary administration for purposes of mere transmission, would not be so imperative. The question, however, is not whether the administrator shall be compelled to account for these assets, but having submitted them to the local jurisdiction, how he shall administer them. He certainly would not be bound to wait an indefinite time for the *Mexican* government or a *Mexican* creditor

to interpose ; and it is of decisive importance, that the person, who claims according to the order of payment prescribed by the *Mexican* law, is not a *Mexican* creditor, but an inhabitant of *Canton*, to whom the *Mexican* government owed neither assistance nor protection. Had he preferred his claim to an administrator in *Mexico,* he doubtless would have been paid according to the rule of priority there, the order of payment being regulated by the law of the forum. But the authorities might have referred him to the administrator here, who is not bound to give him any advantage, to which he is not entitled in common with the domestic creditors. Were a *Mexican* creditor to appear, the case would be different. Perhaps our courts would direct a portion of the assets, sufficient for the demand, to be returned to the proper officer in that country : certainly they would not compel payment to be made in a way to deprive him of any advantage he could claim by its laws, or suffer him to be prejudiced by an irregular abduction of the assets from its jurisdiction. But the appellant is not entitled to the same consideration ; and we are satisfied that the instrument, under which the assignees claim, was properly preferred as a specialty.

                                                        Decree affirmed.