## Alston *v.* Foster and Wife.

A. S. J. Alston died in the state of Tennessee, leaving a widow and two infant children. By last will and testament he appointed his brother guardian of his children, who qualified under the laws of Tennessee, and took possession of the children. The widow subsequently intermarried with C. A. Foster, and removed to the state of Mississippi. Foster and his wife went to Tennessee with an armed force, seized the children, and took them to their residence in Mississippi, where they procured for themselves letters of guardianship. On application to the chancellor by the testamentary guardian for a writ of *habeas corpus,* to recover possession of his wards; held by the chancellor, that the custody of the children must be restored to the testamentary guardian, and that the letters of guardianship obtained by Foster and wife in the state of Mississippi were fraudulent and void.

GEO. S. YERGER for the petitioner.

WM. E. ANDERSON for defendants.

The CHANCELLOR.

The petitioner sued out a *habeas corpus* for the purpose of recovering from the defendant the custody of the persons of Mary H. and Ann S. J. Alston, minor children of A. S. J. Alston, deceased, whose custody he claims as their testamentary guardian. A good deal of testimony has been taken on both sides, a particular analysis of which is not deemed necessary, as much of it is conceived to have no direct relevancy to the question to be decided. It appears from the proofs, that J. J. Alston was appointed the guardian of the children in question by the last will and testament of his brother, A. J. S. Alston, who died in Tennessee, being then a member of the same family with the petitioner; that such will was duly made, published and probated according to the laws of that state, which gives to the father the right of appointing a guardian to his children by last will and testament; that said guardian took upon himself the duties and burdens of that office, and continued in the faithful discharge thereof, until the

mother of the children having intermarried with the defendant, Foster, removed to Holly Springs, in this state, and some time afterwards proceeded to Tennessee with an armed force, seized the children and forcibly brought them into this state, where she and said Foster procured themselves to be appointed guardians; and by virtue of that appointment, connected with what is supposed to be the superior right of the mother, now claim to retain the custody of the children aforesaid. The testimony is ample to show, that no objection can be fairly urged to either party, so far as their capacity and general fitness for the custody and control of the minors are concerned. There is then no room left on that score, for the exercise of that discretion which courts of justice some times properly exert in such cases against even the legal rights of a person who is morally unfit to enjoy them.

The contest here is between an uncle claiming as testamentary guardian of the children, by virtue of appointment by the father, made in the state of Tennessee, and the step-father and mother, insisting on the other hand, as well upon their relation to the children, as upon their letters of guardianship granted them in this state. The case must be decided with reference to their respective legal rights, without indulging in any of that loose, undefined discretion, which sympathy for the wishes and feelings of the mother might suggest.

The first inquiry is: has Alston shown enough to entitle him *prima facie* to have his claim under the habeas corpus sustained? And, secondly, does the grant of letters of guardianship to the defendant, in this state, overreach and defeat those granted to the petitioner in the state of Tennessee, so far as the custody of the persons of the wards is concerned. As to the first branch of the inquiry, it was contended that the tribunals of this state cannot, for any purpose, recognize the petitioner as guardian of the children, upon his letters granted in Tennessee; and that this preliminary objection forecloses all further inquiry. It is said that the rights of foreign guardians are placed upon the same footing with those of foreign executors and administrators; and this seems to be true, at least so far as the right to maintain suit for the property of their wards is concerned. 1 John. Ch. R. 153; 4 Gill & John. R. It cannot be doubted, that an administrator, as such, cannot claim

*de jure,* to have his title recognized beyond the territory of the government granting it; yet, that he is to some extent so recognized by foreign countries, upon rules of national comity, seems to be fully sustained by adjudged cases; as in the case of an ancillary administrator, after the estate has been subjected in his hands to the claims of the citizens of the local jurisdiction, the assets are then decreed to be remitted to the foreign administrator, thus acknowledging his title as such.   1 Mason, 38; 19 Mass. Rep. 337; 3 Pick. Rep. 128; 3 Rawle, 312.

The reason why an administrator cannot maintain a suit for property out of the state granting him his letters, is conceived to rest not so much upon the fact that the courts of one state do not recognize what has been done by the tribunals of another, as upon the more obvious principle, that it is inconsistent with the protection which every state owes to its own citizens, to permit the property of a foreign decedent, situate within its territory, to be transferred to the hands of a foreign administrator, until it has first been subjected to the just claims of its own citizens.   Hawey *v.* Richards, 1 Mason, 381; 9 Wheaton Rep. 565; 3 Rawle Rep. 312; Story's Con. L. 421–2.   These decisions rest upon the familiar rule of international law, that no state is under any obligation to enforce foreign laws prejudicial to its own rights or those of its citizens.   If this be the main reason of the rule, it would seem to have no application to a proceeding by a foreign guardian to recover the person of his ward, who had been violently taken from him, and removed to this state.   It is difficult to perceive, in such a proceeding, any thing against the policy or public morals of this state, or which could affect the private interest of its citizens.

A just regard to those rules of reciprocity which constitutes the basis of all national comity, would seem to require our courts to afford to such guardian every facility known to the forms of our law, lest our own citizens should in their turn be made the victims of a like system of violence, and be left without remedy.   In the case of the King *v.* Hopkins and Wife, 7 East's Rep. 577, where the mother of an illegitimate child had been deprived of its custody by force and stratagem, Lord Ellenborough said, in such a case, every thing was to be presumed in her favor; that, without touching the question of guardianship, he thought it proper, by

means of the remedial writ of habeas corpus, to restore the child to the quiet custody in which it was before its abduction. But however this may be, it is believed that the claims of the petitioner may be sustained upon rules of strict right, testing them by the analogy of the law governing the case of a foreign administrator. A material distinction exists between the case of a foreign administrator, claiming merely to maintain a suit in' that character, and the case where he claims to assert rights which accrued and vested in him according to the laws of the country creating him such. In the first case he must obtain a new grant of guardianship before he can maintain suit, as well for the reasons before suggested, as that his authority cannot strictly extend beyond the power granting it. But in the latter case he proceeds upon his rights and interest vested by virtue of his fiduciary character, which he may prove and assert every where, without doing more, as is the case of a foreign administrator who has there reduced the personal property of his intestate to possession, and thus clothed himself with a qualified legal right thereto. If such property is removed to another country without his consent, he may maintain a suit for it there, in his own name, without taking out new letters of administration. Story's Confl. L. 432; 2 Pick. R. 11; 3 Mason, 505, sec. 18. His claim to maintain suit in such case rests upon his right to the thing, and not upon his character as administrator, although it vested in right of that character. 16 Mass. Rep. 71. As it seems to be admitted that the same rule in a like case would apply to a foreign guardian sueing for property, no reason occurs to me against the extension of the rule to the case of such guardian sueing for the custody of the person of his ward. In this case Alston was fully invested in Tennessee with the care and control of these minors, and the right to the custody of their persons, they being residents and domiciled in that state at the time of his appointment.

It is said, however, that the guardian's right to the custody of the person of his ward bears no analogy to that in reference to his property. It is true that this right is not strictly a right of property, but I apprehend that it is not on that account less perfect and complete, nor less entitled to judicial notice and protection, than if it pertained to things real or personal. Such a guardian has not a mere office or authority, but has an interest in the custody of

the person of his ward; that it is not a right of that imperfect obligation of which courts of justice do not take cognizance, is evident from the fact that prior to the statutes of Westminster 2, ch. 35, giving the writ of ravishment of ward, the guardian might recover damages by his action of trespass at common law for the taking away of his ward. Bingham on Infancy, 168, sec. 7. But it is believed that the courts of our state should at all times so far recognize letters of foreign guardianship, as to permit the guardian to be heard on his claim to the restitution of the custody of his ward, which had been wrongfully taken from him. It is properly a mere question of evidence; the fact of a foreign guardianship or not, should be the only inquiry. Our laws as to some purposes seem to recognize the foreign grant of letters as evidence of the simple fact of such guardianship. Howard & Hutchinson, 340, sec. 18. But then it is contended that such guardianship confers no power when so proved. Such a rule in regard to property rights is, as we have seen, a mere rule of the courts, founded on considerations of public policy, which have no bearing upon a case like this. Neither the researches of the learned counsel for the defendants, nor those of my own have furnished me with any adjudged case applying the rule to the personal relation between guardian and ward. Such relation would seem of itself to confer the right here insisted on.

By the common law, a guardian has equally the care and control of both the person and property of his ward. The civil law practice of placing the care of the person of a minor in one set of hands, and that of his property in another, has not been adopted in this country. Such guardian is to be considered, so far as the person of his ward is concerned, as standing *in loco parentis*, clothed with the same power as the father or natural guardian, who certainly could maintain a *habeas corpus*, in a case like this, for the recovery of his children.

Sir William Blackstone, in treating of the *personal* relation of guardian and ward, says, that their power and reciprocal duty are the same, *pro tempore*, as that of father and child. 1 Black. Com. 463.

I am aware that Judge Story has stated the rule to be, that a foreign guardian can exercise no authority over either the person

or personal property of his ward in another state; and he puts the rule upon the same reasoning and policy which restricts the authority of foreign executors or administrators. Story's Confl. Laws, 414. If he means by this that a grant of letters in one state conferred no power over the person of a minor domiciled in another state, he is undoubtedly correct; but if, as is contended, he means the guardian of the ward's domicil cannot recover him in another state, without new letters, then, with great deference to the opinion of that learned judge, it seems to me that the reason and policy of the rule fails entirely when applied to the case of a guardian asking merely for the custody of the person of his ward, which had been violently and wrongfully wrested from him. It is quite certain that the cases of Morrel v. Dickey, 1 John. Ch. R. 153, and Caft v. Wickey, 4 Gill & John. R. 332, referred to by the learned judge, lay down no such rule with reference to the guardian's authority over the person of his ward. To require that a foreign guardian, whose ward had been forcibly abducted, should take out new letters of guardianship wherever his ward might be found, before his claim to restitution would be recognized, would be "to palter with him, and cheat him with the words of promise." The publicity of such an act, and the necessary delay in accomplishing it, would be but so many signals to the abductor to flee to another jurisdiction, still requiring new letters, and so *toties quoties,* until justice, weary in pursuit, would flag in utter despair.

To compel Alston to obtain letters of guardianship in this state before he can be heard to assert his claim to the custody of his wards, would place upon him impossible conditions, and would be tantamount to a total denial of his rights. It will be remembered that the probate court of Marshall county, in this state, has already granted letters to Foster and wife. Alston would be compelled to apply to the same court, the minors being now resident in that county. He would be told, the court has already adjudged the guardianship of those children to Foster and wife; and we hold that there cannot be two separate guardians of the persons of the same minors, deriving their appointment from the same tribunal, and each claiming the separate and exclusive custody of such children. It would be in vain that he would urge as a rea-

son for repealing the letters of Foster, the fact of his prior grant under the laws of Tennessee. He would be told, on the authority of the case from 4 Gill & Johns. Reports, we cannot notice your letters granted in Tennessee, and, inasmuch as the letters we granted to Foster are in accordance with the forms of the law of this state, we cannot disturb them. It will thus plainly appear, that, unless Alston is permitted to rely upon the will, and his letters granted under it in Tennessee, and upon his right to the custody of the minors which he there acquired, he is wholly remediless, and that a claim acquired by force, and attempted to be perpetuated by a fraud upon the jurisdiction of one of our courts, must prevail against the plainest rights.

I think then that it will appear that Alston is in a proper position to assert the claim which he makes under this *habeas corpus*, unless he is forestalled by reason of the grant of guardianship in this state: and this brings me to the second branch of our inquiry. It may be laid down as a maxim of jurisprudence of universal application, that no court can by its judgment affect or bind persons not within its jurisdiction. The court in this state had no power to grant letters of guardianship over these minors, they not being in legal contemplation domiciled in this state. To create the legal idea of domicil the residence must be voluntary, for if it be by constraint, or by banishment, arrest, or imprisonment, the antecedent domicil remains. Story's Confl. L. 46. Besides this, it may be remarked that the law wisely regards infants as generally incapable of changing their domicil during their minority, and fixes it with that of the father, upon whose death the children still retain the parental home as their domicil. Story's Confl. L. 44, 45. In this case the minors were forcibly removed from Tennessee, the domicil of their deceased father, and of their testamentary guardian into this state, and upon this residence of constraint, the courts of Marshall county assumed jurisdiction over their persons. Courts of justice will not permit their jurisdiction to be either sustained or defeated by fraud or violence. Suppose a citizen of Louisiana was seized and forcibly brought into this state, to be subjected to the process of one of our courts at the instance of a creditor here, would such a proceeding be tolerated? Would not a judgment in such case be regarded as a mere nullity by

every tribunal having about it the semblance of science or civilization. It would be a disregard of all the courtesies due from one state to another to permit a fraud practised upon the citizens of one state to be consummated through the tribunals of another. Such a state of things would not only be fraught with the most startling consequences to the peace of neighboring communities, but would violate that comity which should be specially observed by coterminous states, who are members of the same general government.

I cannot, then, regard the defendants' letters of guardianship, granted in this state, as giving them any valid claim, as against the petitioner to the custody of these children; and, as it does not appear that Alston is in any way unsuited to the trust with which he was charged by the will of his brother, nor that the children are of that tender age requiring the special and exclusive care of their mother, their custody must be restored to their testamentary guardian.

*Note.*—An appeal was taken from the decision of the Chancellor to the High Court of Errors and Appeals, where the case was argued at great length, before Associate Justices TURNER and TROTTER, Chief Justice SHARKEY not being present at the hearing. Messrs. TURNER and TROTTER reversed the decree of the Chancellor. Chief Justice SHARKEY delivered an able dissenting opinion, concurring with the Chancellor. The case is reported at length in 6 How. Rep. 406.