# Fry's Election Case.

1. Students at a college living at the place in which it is located, whether supported by themselves and emancipated from their fathers' families, with no intention to return to their home, or supported by their parents, who visit their home in vacation, and may or may not return after graduating, have not such residence as will entitle them to vote in the district where the college is.

2. Under the constitution and election laws, state and district residence are the same.

3. " Resident" means one who has a permanent abode; it does not include one sojourning temporarily, or for some special purpose.

4. Removal without intention permanently to reside elsewhere will not lose residence; nor will intention to remove permanently not followed by actual removal acquire it.

5. Residence under Art. 3, sect. 1, of the Constitution is, that place where the elector makes his permanent or true home, his principal place of business, and his family residence, where he intends to remain indefinitely and without present intention to depart.

6. The question of residence and authorities extensively examined and discussed in this case.

[Fry's Election Case.]

March 19th 1872.    Before THOMPSON, C. J., AGNEW, SHARS-WOOD and WILLIAMS, JJ.

Certiorari to the Court of Quarter Sessions of *Lehigh county:* No. 86, to January Term 1871.

This case was argued at Harrisburg May 13th 1872.

The proceedings in this case were commenced by the petition of citizens of the Second Ward in the city of Allentown, contesting the election of certain persons returned as elected members of the common council of that city.

The parties afterwards agreed on the following case stated:—

It is admitted that at the municipal election in the Second Ward of the city of Allentown, held October 11th 1870, George B. Roth received 223 votes for the office of common council; George Fry received 218 votes for said office; that John Nonnemacher received 208 votes for said office; and Eli J. Saeger received 211 votes for said office; that the election officers returned that the said George B. Roth and George Fry were elected; that two petitions were filed in due form of law in the Court of Quarter Sessions—one alleging that said Eli J. Saeger was elected instead of said George Fry to said office,—the other alleging that said John Nonnemacher was elected instead of said George B. Roth to said office; that said George Fry and George B. Roth filed their respective answers to said petitions, admitting that the persons named in the petition, except one, did vote; that the following named persons did vote for said George Fry and said George B. Roth, to wit, J. A. Schaffer, and 11 others.

It is further admitted that the said voters are students at Muhlenberg College, an institution of learning located in said ward; that they are citizens of the state of Pennsylvania; that they claimed that their residence was in said college, where they have lived from one to three years; that they came to Allentown from other counties for no other purpose than to receive a collegiate education, but intended to leave after graduating; that they were assessed and paid taxes before said election.

It is further admitted that these students are divided into two classes, as follows:—

The First Class: Those who support themselves, or are assisted pecuniarily by persons other than their parents, are emancipated from their fathers' families, have left the home of their parents, and never intend to return and make it a permanent abode. In this class are S. W. Kuhns, and four others.

The Second Class: Those who are supported by their parents, visit their parents' home during vacation, and may or may not return there after graduating.

It is further admitted that of the votes cast for said John Nonnemacher and Eli J. Saeger there are three, those of J. H. Neiman, and two others, also students at said college, who claimed residence

21 P. F. SMITH—20

[Fry's Election Case.]

in said ward; that they did not intend to remain here when they came; that they came to receive a collegiate education, and leave after they graduate.

The legality of said votes is disputed, and the question as to the legal effect thereof is submitted as a matter of law for the court. If the court should be of the opinion that the persons named, or any of them, are legal voters, then their votes are to be allowed and counted in favor of the party for whom they were cast. All of said votes which, in the opinion of the court, are illegal, are to be cast out, and then the court to decree in favor of the parties having the highest number of votes.

On the 5th of June 1871, the court (Longaker, P. J.) made a decree declaring Eli J. Saeger elected, and the certificate of election theretofore issued to Fry to be void.

On the removal of the record by Fry to the Supreme Court, this decree was assigned for error.

The charter of the city of Allentown, approved March 12th 1867, sect. 4, provides: "That the citizens of said city who are otherwise qualified voters under the laws of this Commonwealth, who shall have *resided* within the bounds of said city at least *six months* immediately preceding the election," shall meet, &c.

*J. W. Wood* and *E. J. More*, for certiorari, referred to art. 3, § 1, Const. of Pennsylvania; Election Law, July 2d 1839, §§ 66, 67, Pamph. L. 532, 1 Br. Purd. 519, pl. 44, 45. The apparent or avowed intention of *constant* residence, not the manner of it, constitutes the domicil: Guier *v.* O'Daniel, 1 Binney 349; Graham *v.* Com'th, 1 P. F. Smith 258; Sears *v.* Boston, 1 Metcalf ·250; Miller's Estate, 3 Rawle 312; Thorndike *v.* Boston, 1 Metcalf 242; Putnam *v.* Johnson, 10 Mass. 487; Granby *v.* Amherst, 7 Id. 1.

*R. E. Wright, Jr., E. Harvey* and *J. D. Stiles*, contrà, referred to same article and section in the Constitution, and sections of Act of 1839; also section 63, 1 Br. Purd. 548, pl. 41., Residence is synonymous with domicil: Cooper *v.* Galbraith, 3 W. C. C. R. 546; Crawford *v.* Wilson, 4 Barb. S. C. 505; Chase *v.* Miller, 5 Wright 404; 1 Bl. Com. 59; Opinion of the Judges, 7 Mass. 523; McDaniel's Case, 3 Penna. L. J. 315; Kneass's Case, 2 Parsons 581.

A domicil is where a person has fixed his habitation without any permanent intention of removing therefrom: Crawford *v.* Wilson, 2 Barb. S. C. 519; Matter of Wrigley, 8 Wend. 142; Phillimore, Law of Dom. 13; Frost *v.* Brisbin, 19 Wend. 11; Green *v.* Wyndham, 18 Maine 225. The intention which gives domicil is an unconditional intention to stay always: The Venus, 8 Cranch 290; U. S. *v.* Penelope, 2 Pet. Adm. 450; White *v.* Brown, 1 Wall. Jr. 217; Guier *v.* O'Daniel, 1 Binn. 349, n.; Casey's Case, 1 Ash. 126;

State *v.* Daniel, 44 N. H. 383; Still *v.* Woodville, 38 Miss. 646; Jennison *v.* Hapgood, 10 Pick. 77; Horne *v.* Horne, 9 Ired. 99; Graham *v.* Public Adm'r., 4 Bradf. (N. Y.) 127; De Bonnaval *v.* De Bonnaval, 1 Curteis 856; Vattel, Law of Nations, B. 1, ch. xix., § 218; Phillimore on Dom. 148; Love *v.* Cherry, 24 Iowa R. 205; Folger *v.* Slaughter, 19 La. An. 323; Mears *v.* Sinclair, 1 West Va. 185; Matter of Fitzgerald, 2 Caines 317; Johnstone *v.* Beattie, 10 Clark & F. 129; Moorhouse *v.* Lord, 10 H. L. Cas. 285; Webster's Works, vol. vi., p. 520. If a person accepts an office which requires that he reside at a particular place, that place is his domicil: Munroe *v.* Douglass, 5 Madd. 379; Code Civil Act 106–107; Abington *v.* North Bridgewater, 23 Pick. 176; The State *v.* Ross, 3 Zab. 527: Ihsam *v.* Gibbons, 1 Bradford 70. A student of a college does not change his domicil by his occasional residence at the college: Granby *v.* Amherst, 7 Mass. 1; Kilham *v.* Ward, 2 Id. R. 236; Harvard College *v.* Gore, 5 Pick. 374; Jennison *v.* Hapgood, 10 Id. 98. Going to a public institution and residing there solely for the purpose of education, would not, of itself, give a right to vote there, because it would not necessarily change the domicil: Opinion of the Judges, 5 Met. 589; Horne *v.* Horne, 9 Ind. 99.

The opinion of the court was delivered, July 3d 1872, by

AGNEW, J.—This cause comes before us upon a case stated, to determine whether certain students at Muhlenberg College in the Second Ward of the city of Allentown, who voted at a municipal election held in that ward on the 11th of October 1870, were legal voters. The question turns wholly upon their residence, the students being otherwise duly qualified voters. The case states—
"that they claimed that their residence was in said college, where they have lived from one to three years; that they came to Allentown from other counties, for no other purpose than to receive a collegiate education, but intended to leave after graduating." They consisted of two classes, to which reference will be made hereafter. The charter of Allentown requires the electors, in addition to prescribed qualifications, to be citizens "who are otherwise qualified, under the laws of this Commonwealth" (Pamph. L. 1867, p. 389). This sends us at the outset to the first section of the third article of the state Constitution. The portion relating to residence is as follows: "In elections by the citizens, every white freeman of the age of twenty-one years, having *resided* in this state one year, and in the election district where he offers to vote ten days immediately preceding such election * * * shall enjoy the rights of an elector." To determine the true residence of these students, we must begin by ascertaining the meaning of the term "resided," in the Constitution. The first thing in the section striking the attention is, that the single word "resided,"

qualifies, without reiteration, both the one year's residence in the state and the ten days' residence in the district. Precisely the same form of expression is repeated in the proviso as to citizens between twenty-one and twenty-two years of age ; the same words "resided" again, and without repetition, qualifying the state and district residence. The qualification is evidently of like character in the clause relating to·qualified voters removing out of the state, who have returned and resided therein six months, and who have resided in the election district *as aforesaid*. It is obvious, therefore, that the state residence and the district residence are of the same nature, and whatever is necessary to constitute the one, is essential to define the other ; the only difference being in their time of duration. The language of the section, thus plain in itself, is rendered completely certain by the history of the introduction of the district residence by the Constitutional·Convention of 1837–38. The tax qualification was a subject of extended debate in the committee of the whole on the third article beginning on page 484, vol. 2, of the *Debates*, and ending on page 133 of the 3d vol. ; some members opposed the tax qualification as restrictive, while others favored it, not only because taxes were a proper contribution by the elector to the support of the state, but were necessary to identify the voters, by means of the registration and assessment of the taxables. Some who opposed a tax qualification, advocated a registry of voters in lieu, and referred to the recent registry law for Philadelphia city and county, which was then a subject of bitter partisan controversy. Its purpose was alleged to be to prevent frauds by " colonizing" or bringing voters into the precinct immediately on the eve of an election. Much was said therefore on the subject of fraudulent voting. This it is to be presumed led Mr. Mann when the amendment embracing the tax qualification was adopted, to move further to amend by adding : " but no person shall be entitled to vote except in the district in which he shall *actually reside* at the time of the election." His amendment was agreed to. Vol. 2, Debates, pp. 560, 561. It did not, however, end the discussion upon the registry law, the tax feature and fraudulent voting. See vol. 3, pp. 30 to 133. But it became evident to the majority that some provision, beside the tax feature, was necessary to identify electors and prevent fraudulent voting, and it led to Mr. Merrill's proposition requiring a district residence of thirty days : vol. 3, p. 134. It was adopted, fixing the residence at ten days, after voting upon the term of sixty, thirty and twenty days : pp. 134 to 143. This, however, fell along with the other amendments to the report, by a majority of one vote. The ten days' residence was again proposed on second reading and adopted : Debates, vol. 9, pp. 297 to 320. The whole section as finally amended and adopted will be found at pp. 197–8, vol. 12. Thus an actual fixed residence and home, as the

[Fry's Election Case.]

means of identifying the elector, and securing the public against frauds, was the evident purpose of the district residence. The same view of home or domicil is stated by Woodward, J., in Chase *v.* Miller, 5 Wright 418.

The state and district residence thus being of the same nature, it is proper now to exhibit that nature more clearly, in order to define it properly. The absence of judicial decision by this court on the point, makes it necessary to examine it in the light of other provisions in the Constitution, and of judicial determinations in analogous cases, as well as in reference to the purpose of the qualification itself. The Constitution provides that senators and representatives shall be *inhabitants* of the *state*, the latter three and the former four years; and the last year, *inhabitants* of the *districts* from which they are chosen. So the governor must be an *inhabitant* of the *state* seven years. Judges of the Supreme Court shall *reside* within the Commonwealth, and other judges, while in office, within the *district* or *county* for which they were elected. It is evident that the term "inhabitant" or "resident" in these clauses cannot mean one sojourning temporarily, or for some special purpose, but refers to one who has a permanent abode; the domicil of the senator, representative, governor or judge. "Inhabitant" (says Webster), "a dweller; one who dwells or resides permanently in a place." The judges of this court sitting in Pittsburg for weeks, at the time of general election, though in the prosecution of their business, yet away from home, have never dreamed they had a right to vote there. No one doubts that one domiciled in another state, but resident here for a special purpose of business or pleasure, is ineligible to election as a senator, representative, governor or judge. It is equally clear, that the electors of the state are those who have their homes within it, and not elsewhere. Their domicil is there, and their home is the place where they permanently reside, and to which they intend to return when away from it. It is also clear, that one domiciled in another state cannot be an elector here, though he be resident here for some temporary purpose, or on some special business, and though his stay may be prolonged upward of a year. Therefore, when the Constitution declares that the elector must be a resident of the state for one year, it refers beyond question, to the state as his home or domicil, and not as the place of a temporary sojourn. This being the character of the state residence, it defines, as we have seen, the district residence; for both are members of the same sentence and are qualified by the same words, "having resided" without repetition. The elector must, therefore, vote at home, not only in the state, but in the district where his home is. His domicil must be there. He may change his domicil within the state, but in order to vote in another district, he must have made the change at least ten days before the election.

[Fry's Election Case.]

If he have a fixed and permanent home in one district, he cannot, because dwelling temporarily in another, in the prosecution of his business, vote in the latter.    The purpose of the district residence, as we have seen, is not only to identify the elector, but to prevent frauds in elections.    But if because he is engaged in some business there, he may vote in the district where he is so employed for ten days, what is to prevent his voting at home and in his proper district?    In these days of swift travelling, one voting in the morning one hundred miles away from home, where he is temporarily sojourning, might vote again at home before night.    He has not lost his domicil, where his family and chief business are, by his temporary sojourn on some special employment.

And again this idea of home or domicil as conveyed by the word "resided" in the Constitution, is strengthened by the origin and use of the term freemen, the noun with which it is coupled. Thus in the laws agreed upon by William Penn on the 5th of May 1682, the second section provides : " That every inhabitant in the said province, that is or shall be a purchaser of one hundred acres of land, or upwards, his heirs or assignees, and every person who shall have paid his passage and taken up one hundred acres of land at one penny per acre, and have cultivated ten acres thereof, and every person that hath been a servant or bondsman, and is free by his service, that shall have taken up his fifty acres of land and cultivated twenty thereof, and every inhabitant, artificer or other resident in the said province, that pays scot and lot to the government, shall be deemed and accounted a *freeman* of the said province, and every such person shall and may be capable of electing or being elected representatives of the people in Provincial Council, or General Assembly in said province."    A freeman was an allodial proprietor ; the opposite of a vassal or feudal tenant ; a free tenant or freeholder as distinguished from a villein. In the Constitution of 1776, he was described as one " having a *sufficient common interest* with, and *attachment to the community*," and as having a "right to elect officers and to be elected to office." He was also one who was liable to military service.    (See my opinion in the case of McCafferty *v.* Guyer, 9 P. F. Smith 115 to 119 for an historical account of the freemen of the province and state as electors.)    The traditionary freeman as thus portrayed was a stable person, a farmer, a resident artificer or mechanic, or other fixed inhabitant, having a community of interest, where he resided, paying to the support of government, and doing military service.    In view of the traditionary character of a freeman, when the Constitution of 1790 was framed, the word " resided" was introduced into the third article to define his residence as an elector. The provision reads thus : " In elections by the citizens, every freeman of the age of twenty-one years, *having resided* in the state *two* years next before the election, and within that time paid a

state or county tax, and which shall have been assessed at least *six* months before the election, shall enjoy the rights of an elector.". Two things are noticeable here—first, that the term "freeman" is not defined, but is used as a well known phrase; and secondly, that the long period of residence and assessment denote permanency of residence.

In the Constitution as amended in 1838, though this section was much discussed and altered, this language was retained without alteration, the term of time only being reduced. The nature of the residence remains the same therefore, and its characteristics being unaltered, it strengthens the interpretation that "residence" in the Constitution means home, fixed abode, domicil of the elector, as distinguished from a place of temporary sojourning.

In his Conflict of Laws, § 41, Mr. Story says: "By the term 'domicil' in its ordinary acceptation, is meant the place where a person lives or has his home. In a strict legal sense that is properly the domicil of a person where he has his true, fixed, permanent home and principal establishment, and to which, whenever he is absent, he has the intention of returning." "Two things (he says) must concur to constitute domicil—first, residence; and, secondly, the intention of making it the home of the party. There must be the fact and the intent:" Id. § 44. See Pfoutz *v.* Comford, 12 Casey 422. Says Judge Rush: "The apparent or avowed intention of *constant* residence, not the manner of it, constitutes the domicil:" note in 1 Binney 351. "It may be defined (he says) to be a residence at a particular place, accompanied with positive or presumptive proof of continuing it in an *unlimited* time :" Id.

Undoubtedly (says Judge King), residence is a question of intention. In cases involving it, the inquiry is *quo animo* the party either moved to or from the state. And upon the solution of this question, depends the fact, whether the petitioner has gained or lost a residence. But before this question can arise *an actual removal must have* taken place. A mere intention to remove not consummated, can neither forfeit the party's old domicil nor enable him to acquire a new one. Removal out of the state, without an intention permanently to reside elsewhere, will not lose residence, nor will a mere intention to remove permanently, not followed by actual removal, acquire it: Case of James Casey, an insolvent debtor, 1 Ashmead 126.

These extracts will enable us to understand more clearly the term residence, as denoting that home or domicil which the third article of the Constitution applies to the freemen of the Commonwealth. It means that place where the elector makes his permanent or true home, his principal place of business, and his family residence, if he have one; where he intends to remain indefinitely, and without a present intention to depart; when he leaves it

[Fry's Election Case.]

he intends to return to it, and after his return he deems himself at home. It remains now to apply these characteristics of residence to the case in hand. The stated case expressly declares that the students referred to in it, came to Allentown from other counties, for *no other* purpose than to receive a collegiate education, but *intended to leave* after graduating. It is evident that the college was not their true and permanent home ; their stay there was not to be indefinite, as the place of a fixed abode, until future circumstances should induce them to remove. Their purpose was indefinite and temporary, and when accomplished they intended to leave. They retained their original domicil, for the facts stated show that they never lost it. On this point the authorities are in entire accord. " The third rule I shall extract (said the Master of the Rolls) is, that the original domicil, or as it is called *forum originis*, or the domicil of origin, is to prevail until the party not only has acquired another, but has manifested and carried into execution an intention of abandoning his former domicil, and taking another as his sole domicil." Sir Richard Pepher Arden, in Somerville *v.* Lord Somerville, 5 Vesey 786. See also 2 Kent's Com. 431, in note ; Story's Conflict of Laws, §§ 46, 47. This language was adopted by Judge Grier in White *v.* Brown, 1 Wall. Jr., 217, adding : " A man cannot be considered a vagabond or person without any domicil, for the domicil of origin is not abandoned until a new one has been intentionally and actually acquired :" Id. 264. See also Judge King's remarks, *supra.* And in Lyle *v.* Foreman, 1 Dall. 480, the defendant was on his way to Fort Pitt, in December 1789, intending to proceed to the Spanish settlements below Natchez, on the Mississippi, when a foreign attachment issued against him. Shippen, president, quashed the attachment, observing : " That while a man remained in the state, though avowing an intention to withdraw from it, he must be considered an inhabitant, and therefore not the object of a foreign attachment." See also Miller's Estate, 3 Rawle 312. In Graham *v.* Commonwealth, 1 P. F. Smith 257, where the question was, whether a soldier who had been two years out of the state as a volunteer in military service, was " an inhabitant of the state, or usual resident therein," under the seventy-seventh section of the penal code, the present Chief Justice said, " his usual residence was not changed by the fact that he obeyed the call of the President and volunteered to fight for his country at her command. To hold the contrary would be against the spirit of all our legislation. A soldier is regarded as a voter because a citizen of the *residence he left* before entering the service, and he votes *there* wherever he may be."

These principles enable us now to dispose of the first of the two classes into which the stated case divides these students, viz. : " Those who support themselves, or are assisted pecuni

[Fry's Election Case.]

arily by persons other than their parents, are emancipated from their father's families; have left the home of their parents and never intend to return and make it a permanent abode." Having, as the case states, come to Allentown for *no other* purpose than to receive a collegiate education, and intending to leave after graduating, they have not lost their home domicil, and could vote there on returning to it though they should not re-enter their father's house.

Emancipation from their father's family and independent support, and the leaving of the home belonging to their parents, have not forfeited their own domicil. Their father's house is not necessarily their home, but the place is where it is. Though not in the bosom of that family, the place of their residence is not lost to them until they have voluntarily changed it and found a new home. Upon the terms of the stated case, it cannot be said they have abandoned their original home, and actually obtained another. The second class needs no comment. They are those students "who are supported by their parents, visit their parents' home during vacation, and may or may not return there after graduating." It is clear as to both classes the college is not their home. They are not members of the community among whom they sojourn. They have no common interest; do not intend to live with, or to cast their lot among them. They have no proper motive to interfere in their local affairs. On no proper principle of a true residence should the student vote to-day and fasten on the community officers whom the majority do not desire, then graduate to-morrow and be gone.

The great underlying principle of a republic is, that men should be permitted to govern themselves, but not to constrain others. Yet this would be the result of such a shifting vote, which, like the Parthian arrow, pierces as he who casts it flees. There are vague notions of liberty and personal rights, which often impress the mind, and lead it to incline against what may seem to be a restraint. A man is a man everywhere, and the thought is apt to rise, a freeman should vote anywhere. But the only true, wise and rational liberty, founded on the golden rule of doing as one would be done by, and upon the maxim *sic utere tuo ut alienum non lædas*, is that which is regulated by laws made for the common good.

The rights of all men, the peace of society, and the good government of the state, require that the elector should vote at home, in his proper district where he is known, and among those with whom he has cast his lot, until yielding to circumstances, or to a desire of change, he has chosen voluntarily to abandon his former residence, and actually to gain a new one.

Judgment affirmed.