Shegogg vs. Perkins et al.

## SHEGOGG VS. PERKINS et al.

1. ADMINISTRATION : *Jurisdiction of courts in.*

The probate court has the exclusive right to make settlements with administrators, which, when confirmed, can never be reinvestigated except in chancery upon a charge of fraud, supported by affidavit. Chancery will then take jurisdiction, not to supersede the probate court, or to withdraw the case from its jurisdiction, but to correct and prevent fraudulent abuse, and to hold the administrator liable for losses or injuries resulting from his mal-administration. It will determine the amount of the administrator's liability and set aside fraudulent settlements made and confirmed by the probate court; and, when the matters in issue are determined, the administration must be remanded to the probate court to be proceeded with as directed by the decree in chancery.

2. DECREE : *What is final.*

A final decree is the order of the court pronounced upon hearing and understanding all the points in issue, and determining all the rights of the parties to the suit, according to equity and good conscience.

If a decree does not profess on its face to dispose of many of the important matters involved in the cause, and it is manifest that the cause was not in condition to be heard upon those matters, and the decree fails to show affirmative action of the court upon them, the presumption may be indulged that they were not under consideration at the hearing or intended to be embraced in the decree.

3. ADMINISTRATION : *Principal and ancillary. Duty of ancillary administrator.*

When different administrations are granted in different countries, that at

the intestate's domicile is the principal administration. It is the duty of the ancillary administrator to collect the assets in his state, and apply them to the payment of debts due citizens of his state, and remit the balance to the principal administrator. He can not allow and pay claims of non-resident claimants. (Harrison, Justice, dissenting).

APPEAL from *Pulaski* Chancery Court.

Hon. J. R. EAKIN, Chancellor.

Before Hon. WILLIAM M. HARRISON, Justice, and Hon. JESSE TURNER and Hon. B. B. BATTLE, Sp. JJ.—Chief Justice ENGLISH and Justice EAKIN being disqualified.

*Brown*, for appellant.

*Clark & Williams, Rose, Farr*, contra.

TURNER, Sp. J.   The plaintiffs, who were heirs at law of Constantine Perkins, deceased, state, that on the fourteenth of November, 1864, the said Constantine, who was a resident of Maury county, Tennessee, died at his home, intestate, leaving a widow, Nancy R. Perkins, but no children. He had a large estate in Tennessee, real and personal, and a valuable plantation in Arkansas, with the usual accompaniments of stock and farming implements.

By the laws of Tennessee the widow was entitled to all his personal property, subject only to the payment of his debts.

By the laws of Arkansas she was entitled to one-half of his personal property, irrespective of the claims of creditors, and to half the rents and profits of his real estate until her dower was assigned her.

That, on the sixth day of February, 1865, the said Nancy R. was duly appointed administratrix of his estate by the county clerk of Maury county, Tennessee; and that, on the sixth day of April, 1865, William Q. Pennington, a resident of Pulaski county, Arkansas, was duly appointed administrator of said estate by the probate court of said county.

Both administrations progressed, the one in Tennessee, and the other in Arkansas, until the commencement of this suit.

The bill alleged in substance: that said administrator (Pennington) and the widow had confederated together in the matter of the Arkansas administration; that the said widow had received from the rents and profits of the plantation for 1864, and the succeeding years, as her share, large sums of money, the estimated amount of rents and profits for three years amounting, as they allege, to $27,-000, the plaintiffs having, in the meantime, received nothing; that the administrator (Pennington) had improperly allowed an account, in favor of the widow, which she claimed to have paid in August, 1865, to the firm of Brennan & Co., of Nashville, Tennessee, for $2,000, denying that she paid it all, or, if she had, alleging it had been paid with money of the estate.

That the allowance of claims against the estate, a list of which they set forth, amount to something over $5,000, all of which have been paid; but as they had no means of proving payment, prayed discovery; conceded dower to the widow; prayed that an account be taken, and for a full and final settlement of the estate, and that after assignment of dower, partition be made of the balance of the lands. The administrator (Pennington) answered: Denied that the deceased resided in Tennessee; stated that in 1865 the widow cultivated 100 acres of the plantation for her own use, free of rent, in consideration that she would claim none of the rents, and that he received that year from the other lands, $600; that for the current year (1867) he had rented the plantation for $4,750, and the whole amount previously received for rents, he stated to be $4,437.05, clear of allowances, one-half of which was paid to the widow. Explain-

ing the claim of Brennan & Co., he stated that it was due for an engine and fixtures put on the plantation in the lifetime of the intestate; that the widow was sued for it, as administratrix in Tennessee; that she compromised the suit for $2,000, and paid her attorney $100, and sent the claim to him, to be allowed against the estate in Arkansas; denied that she got the money from him. He admitted the list of probated claims set forth in the bill, to be correct, with the addition of a claim allowed himself, which was pending when the suit commenced, and showed a balance of money to his debit of $2,028.48. He concluded with a demurrer to the jurisdiction of the court.

Nancy R. Perkins (the administratrix) answered and made her answer a cross bill, claiming the whole of the rents and profits of the land until assignment of dower; denied all confederation with Pennington; admitted that she received her share of the corn and cotton crops for the year 1864, amounting to the sum of $1,421.95.

She admitted the use of 100 acres of land in 1865, which she claims as her right, but denies using any afterwards; also, that she received from Pennington $1,998.80, one-half of the clear rents of 1866, but claimed that she was entitled to the whole. Explaining the claim of Brennan & Co., she stated that her husband had been sued upon it in his lifetime for a larger amount, and that after the grant of administration to her, she was threatened with a revival of the suit, and that, by the advice of William C. Perkins, she had compromised it by paying $2,000 to the claimant, and $100 as fees to her attorneys; that she presented this claim to the Arkansas administrator for reimbursement, because she thought it most proper to have it allowed against the Arkansas property, as it was contracted for that; denied that she had received any of the personal property of the Ar-

kansas place except a mule valued at $25, but that Pennington had bid off for her at the sale, other personal property of the value of $312, for which he had accounted, and paid her, with that, the sum of $455.65 as her half of the sale of the other personal property.

She also set up a parol contract between her husband and Pennington, for an exchange of eighty acres of land, which she alleged had been carried into effect by her husband's occupancy and cultivation for a number of years, and now constituting part of the land in which she claims dower, and prays a specific performance against Pennington. She also claimed the whole of the rents and profits until the assignment of dower.

On the twentieth of December, 1867, Pennington filed a supplemental answer, admitting the receipt of the corn and cotton of the crop of 1864, as stated by said administratrix, and corrected his former statement of balance in hand, to show the balance to be $3,626.44.

On the twenty-third of June, 1868, the plaintiffs answered the cross bill of said administratrix, in which they insisted that the domicile of deceased was in Tennessee, and protested against her claim for all the rents and profits.

They still insisted that the allowance of the Brennan claim was wholly wrong, and that it should have been paid out of the estate in Tennessee, and allege that another claim allowed by the administrator here in favor of John Rowland was improperly allowed. That they believed it had been allowed for the benefit of Mrs. Perkins; that nothing was due him, and that if anything was due Rowland, as claimed, it had been presented here in Arkansas by her procurement to relieve the personal property in Tennessee.

Issues were made up on the twentieth of July, 1868, by the answer to the cross bill of the guardian, *ad litem*, of the minor heirs of Thomas Perkins, deceased, and by replication of the plaintiffs to the answers of Nancy R. Perkins and Pennington to the original bill.

A number of depositions were taken, filed and published on the eighteenth of February, 1869.

These depositions relate only to the residence of the deceased, and concerned nothing else in issue.

The record shows that upon these pleadings, and the accompanying exhibits, the cause was heard on the fifteenth day of December, 1869. The chancellor found that the said Nancy R. Perkins, widow of the said Constantine Perkins, was entitled to dower in the estate of said Constantine, as follows, to-wit: " To one-half of all the personal property and choses in action of which the said Constantine died possessed, as well as to one-half of all the clear rents and profits of the lands of said estate, absolutely and for her own use forever; and also to a life interest in one-half of all the lands of which the said Constantine died seized and possessed." Dower decreed accordingly, and commissioners appointed to make the assignment thereof in the lands, which were particularly described.

The same commissioners were also appointed to take an account of the rents and profits of the lands after the death of the said Perkins, and it was decreed that plaintiffs were entitled to partition of the balance of said lands, etc.

The plaintiffs afterward filed a supplemental bill, to which the said Nancy R. and Pennington appeared, on the twelfth of September, 1870.

On the seventh of November following, the said Nancy

R. and Pennington moved to strike out this supplemental bill.

On the eighth of March, 1871, leave was given plaintiffs to amend the supplemental bill, and on the fourth of April following, the bill was struck from the files at the cost of the plaintiffs. On the next day, April 5, 1871, the report of the commissioners appointed to assign dower was taken up and confirmed. It simply assigns dower in the lands, taking no account of rents and profits. No exception has ever been taken to this assignment of dower.

On the nineteenth of May, 1871, plaintiffs filed a motion to reform and correct the decree of December, 1869, and to reinstate the supplemental bill, which at that term had been struck from the files, basing their motion upon the affidavit of George C. Watkins, Esq.; the effect of which is that the decree was framed and entered hastily by the attorney for Pennington, and is not according to the understanding, which was that the decree should be interlocutory for the purpose of ascertaining dower and to take an account for future action, and not to be decisive of the rights of the parties; that the case was not actually heard by the chancellor then sitting, who only consented that the decree might be entered up as understood by the attorneys, etc.

The attorney for Pennington, C. B. Moore, Esq., filed a counter affidavit in opposition to the motion, to the effect that the decree was drawn as he understood the agreement, which was that it should be final as to all matters save dower; and contends that he so intended it at the time, and insists that it should so stand. The motion was not then acted upon, nor was any further proceeding had in the cause for many months.

On the twenty-second of February, 1872, while the

motion was pending, the plaintiffs asked leave to with-draw the amended supplemental bill, which they had previously attempted to file, and upon leave they were then allowed to file a supplemental and amended bill with the exhibits thereto.

Pennington appeared to it, and was granted until rule day to answer. His securities, Tucker and Bertrand, also appeared. Edward Shegogg (who had become the hus-band of Nancy R. Perkins) and his wife refused to appear, and a warning order was made, as to them.

In the meantime, pending this suit, Pennington was proceeding with the administration, filing accounts current, etc. The amended and supplemental bill of the twenty-second of February, 1872, assails these accounts and settle-ments as fraudulent, and repeats the charge of fraud against the said Nancy R. (now Shegogg), in the allowance of the Brennan claim; and charges the allowance of the Rowland claim to be fraudulent also, and that Pennington had fraudulently obtained an order from the probate court to employ an attorney to defend this suit, which was not against the estate but against himself, on account of his own mal-administration. That the accounts and settlements filed in the probate court were in contempt of authority, and except to them as fraudulent.

A full transcript of the proceedings and settlements in the probate court are filed as exhibits in the cause.

The plaintiffs charge mismanagement of the estate in many ways, and allege a relationship and connection be-tween Nancy R. Shegogg (late Perkins), Pennington and one Chravis, hostile to the interests of the estate, and prayed an injunction against Pennington, to restrain him from further proceedings in the probate court. Ask that an account be taken of all the matters charged with regard

to the assets received, or which ought to have been received by the administrator. That he be charged with the Brennan allowance, which they allege was collusively and fraudulently paid to the said Nancy R. That the securities be held liable for any deficiency, and that the money, when collected, be brought into court and distributed under its order.

The injunction prayed for was ordered on the twenty-ninth of February, 1872.

The record fails to show any answer of Pennington to the last bill, while there is among the papers of the cause an answer of his, which appears to have been intended for the first supplemental and amended bill, and which puts in issue the material matters alleged in the last bill, and although it bears date in 1870, we may reasonably assume that it was intended to be filed as a response to the last bill.

The answer contains a demurrer to, and protest against, the jurisdiction of the court.

On the fifth of December, 1872, the death of Pennington was suggested, and the suit was revived against the administrator.

The death of Mary A. Bradley was also suggested, and the suit revived against her heirs at law.

Shegogg and wife answered on the twenty-fourth of May, 1873. She denied any and all fraud, either in the Brennan or Rowland claim, and asserts that she had the right to pursue the course admitted by her to have been taken.

She says that the personal estate in Tennessee has turned out less than she supposed, although, at the time of the Brennan settlement, she did not doubt its sufficiency. She exhibits, with her answer, the inventory returned and

filed by her in Maury county, Tennessee, which contains a large amount of personal property, consisting of furniture, cattle, carriage, mules, horses and other property about the place, which is not valued. Also, an inventory of notes reported good, amounting to something more than $8,000, besides $5,250 in gold.

A large list of notes reported doubtful were also included. Of those returned as good, the exhibits show a subsequent report to the court of the insolvency of more than $6,000.

Solomon F. Clark appeared as the administrator *de bonis non* of the estate of Constantine Perkins, deceased, and was ordered to rent out the lands.

Thomas Fletcher, as administrator of Pennington, filed an answer. Tucker's assignee in bankruptcy also appeared, and the administrator of Bertrand appeared and filed a demurrer and answer.

On the nineteenth day of March, 1875, the cause came on for final hearing, and was submitted to the court on the pleadings and papers in the cause, and argument of counsel; whereupon, the chancellor decreed that there is fraud in the settlements of William Q. Pennington, deceased, as administrator of the estate of Constantine Perkins, deceased, and that said accounts should be surcharged and falsified, and that an account should be taken of the amounts due from the estate of said Pennington, with which it would properly be chargeable, upon an adjustment of his accounts as administrator; and that the claim of Brennan & Co., allowed by the said Pennington against the estate of the said Perkins, be wholly disallowed and rejected, and that all the settlements of the said Pennington, as administrator as aforesaid, made with the Pulaski county probate court, be annulled for his fraud, as charged

by plaintiffs, and that said account be restated by the special master of the court, and that he make report thereof to the next term of the court thereafter.

From this decree Nancy R. Shegogg, a defendant in the original and supplemental bills, appealed to this court, and there was also a cross-appeal by W. O. K. Perkins et al.

The record presents several questions for our consideration:

1. As to the question of jurisdiction. The original jurisdiction of courts of equity in the administration of assets is founded on the principle that it is the duty of courts to enforce the execution of trusts, and that the executor or administrator, who, as trustee, has the property in his hands, is bound to apply it to the payment of debts and legacies, and the surplus, if any, according to the will of the testator, or, in cases of intestacy, according to the statutes of distribution.

It is true the probate court has the exclusive right to make settlements with administrators, which settlements, when confirmed, can never thereafter be subject to investigation, unless in a court of chancery, upon the allegation of fraud, supported by the affidavit of the party making such allegation.

The court of chancery, then, upon the allegation of fraud, as in this case, will entertain jurisdiction of the bill, not for the purpose of superseding the probate court, or withdrawing the case from its jurisdiction, which it has no power to do, but to correct and prevent fraudulent abuse, and to hold the administrator accountable for losses or injuries to the estate, resulting from his mal-administration. The court can determine the amount of liability with which the administrator ought to be chargeable, and may annul and set aside settlements made and confirmed

by the probate court, if their fraudulent character is made manifest. The court, however, confines itself to questions arising in the course of the administration between parties interested in the estate, and does not attempt to set up an administration independent of the probate court. On the contrary, when the matters in issue are determined by the court, the administration must be remanded to the probate court to be proceeded with there, according to the decree of chancery in determining the rights and liabilities of the parties in interest.

2. As to the effect of the decree of the fifteenth of December, 1869:

It is contended by the learned counsel for Mrs. Shegogg that the decree is final and conclusive, as to all matters put in issue by the pleadings; and this position is plausibly and ably maintained in the argument of counsel, and yet we can not think it was so understood by the plaintiffs' solicitors, or was the design of the chancellor. The court decreed dower to the widow of Perkins and provided for its assignment. It was accompanied by a further decree for partition. The widow's rignt to dower was conceded, and the only question was as to its extent. The right of the heirs of Perkins to partition was not contested. The widow, as such, claimed all the rents and profits of the plantation, accruing before the assignment of dower.

This right she asserted as a resident, in virtue of the alleged residence of her husband in Arkansas, while her rights to more than half was resisted, on the ground of his alleged non-residence in Arkansas.

The hearing of the cause, if hearing it could be called, was singularly imperfect and incomplete.

The residence of Constantine Perkins was important as determining the extent of the widow's right to dower in

the rents and profits of the real estate before dower assigned; hence, up to this time, all the evidence taken in the cause is confined to Perkins' residence, and none of the depositions have any allusion to the alleged waste and mismanagement of the estate. The liabilities of the administrator, his failure to file annual accounts current, his wrongful allowance of the claim of Brennan & Co., and other acts of mal-administration charged, are totally ignored, and seem not to have been in the mind of the court at the rendition of the decree.

Whatever the decree may seem to be in form, we are disposed to regard the action of the chancellor as a preliminary disposition of matters mostly not contested, which, though final and conclusive as far as it goes, was not intended to be, and is not, final and conclusive as to the other material matters in issue between the parties, in reference to which, in point of fact, there seems indeed to have been no hearing at all.

A motion was made by the plaintiffs to correct and reform the decree.

This motion was not formally granted, but the plaintiffs had leave to file their amended and supplemental bill, which involved the same matters embraced in the original bill, and the cause, on the amended pleadings, proceeded to a hearing.

Is then the decree final as to all matters put in issue by the pleadings? We think not. It does not profess on its face to dispose of any of the important matters involved, except the subjects of dower and partition, and it is quite apparent that the cause was not in a condition to be heard upon the other matters involved in the pleadings, and we think if the decree fails to show affirmative action of the court upon these matters, the presumption may be indulged

that they were not under consideration at the hearing, or intended to be embraced in the decree of the chancellor.

"A final decree is the order of the court pronounced upon *hearing and understanding all the points in issue,* and determining all the rights of the parties to the suit according to equity and good conscience." *Lube, 156.*

"A decree is final *when all the facts and circumstances material and necessary to a complete explanation of the matters in litigation are brought before the court,* and so fully and clearly ascertained on both sides, that the court is enabled, upon a full consideration of the case made out and relied upon by each party, *finally* to determine between them according to equity and good conscience." *1 Barb. Ch. Prac., 330; 2 Litt., 261; 7 Paige, 18; 4 How. Miss., 485; 1 Ark., 391; 10 Ark., 333.*

And to this effect we think are most of the authorities referred to by the learned counsel who contends for the absolute finality of the decree of the 15th December, 1869.

This decree does not profess to dispose of all the matters in controversy between the litigants. On the contrary, the circumstances attending its rendition, taken in connection with the face of the decree itself, conclusively shows that material matters in issue between the parties were not heard, considered or acted upon by the chancellor, and not intended to be embraced in the action of the court.

We are, therefore, of the opinion that the decree, except as to matters of dower and partition, was not final and did not, in any wise, affect the other matters in controversy, which remained open for the future action of the court.

3. As to the validity of the claim of Brennan & Co.

Two administrations were granted on the estate of Constantine Perkins. One by the county court of Maury county, Tennessee, the place of his domicile, where he

owned a large estate, and the other by the probate court of Pulaski county, Arkansas, where he also owned a large estate.

By the long since settled law, when different administrations are granted in different countries, that is deemed the *principal* or *primary* administration which is granted in the country of the domicile of the deceased party; for the final distribution of his effects among his heirs, or distributees, is to be decided by the law of his domicile. Hence, any other administration which is granted in another country is treated as in its nature *ancillary* merely, and is generally held subordinate to the original administration.

The Tennessee administration, then, is to be regarded as the *primary*, and that of Arkansas as the *ancillary* administration.

It is alleged in the bill that the claim of Brennan & Co. was allowed in Arkansas through the fraudulent procurement of Mrs. Shegogg (Perkins) in confederation with Pennington, the Arkansas administrator.

The claim originated in Tennessee, where all the parties in interest resided. At the time of the death of Perkins a suit was already pending in one of the Tennessee courts for the recovery of this claim. After the death of Perkins this suit was compromised, and the claim sent to Arkansss for allowance.

Both administrations controlled a large amount of assets, but our conclusion is, that the personal effects of the deceased in Tennessee was more than sufficient to have paid all of his debts, and especially his Tennessee debts ought to have been paid.

The Arkansas administration was purely ancillary, and the only duty devolving upon the administrator was to

collect the assets here, and to appropriate so much of the avails of the same to the payment of debts due to our citizens, as would be authorized by the general solvency or insolvency of the estate of the deceased, and remit the balance to the place of primary administration. See *3 Met. (Mass.), 114; 8 Pick., 475, 11 Mass., 256; 2 Mass., 384; 13 Pick., 23; 3 Penn., 185; Story's Conf. of Laws, sec. 518; 2 Kent, 434.*

Here the question presents itself: Was the ancillary administrator in Arkansas authorized to allow this claim as in case of the claim of a local creditor residing in this state? We think not.

In the case of *Churchill et al. v. Boyden, adm'r, 2 Wash. Vermont Reports, 321,* REDFIELD, J., in delivering the opinion of the court, said: "The only question here, is, whether the creditors of an estate where the principal administration is out of the state, and an administration of the estate has been granted here, are all alike entitled to have their demands allowed by the commissioners appointed here; or whether the commission extends only to resident creditors.

"We think it may be regarded as well settled in this state, that it is only the latter class of creditors who are entitled to have their claims allowed here." The court further said:

"I am aware that upon general principles of moral equity, there may be much said against this rule of allowances. But the law seems to be so settled in most of those countries where the common law of England prevails, and in many others. It has never been questioned that the court of probate, where the ancillary administration is, will take no notice of foreign creditors, and not usually of foreign legatees or distributees." *5 Vt., 333; 6 Vt., 374; 7 Vt., 170; 3 Pick., 128; 3 Penn., 185; 81 Penn. S., 441; 3 Rawle,*

*312; 20 N. Y., 103; 9 Wall., 740; 2 Kent, 434,* and note *a, Story's Conf. of Laws, 334, 336-7,* and authorities there referred to; *7 Johns' Ch. Rep., 45-47.* And to the same effect is a late decision of the supreme court of Pennsylvania. See *Barry's appeal—Foster's estate.* An abstract of this decision may be found in the *Southern Law Review, Vol. 5, No. 1, for April and May, 1879, p. 142.*

In that case the court decided that: "In ancillary administrations in Pennsylvania, of the effects of a decedent who was domiciled elsewhere, the court will pay only such claims as are proved only residents of Pennsylvania, and order the fund to be turned over to the foreign administrator, and non-resident creditors must resort to that jurisdiction."

This court has never expressly decided the question under consideration, yet our decisions, so far as they go, are in harmony with the authorities here cited. See *Clark v. Holt, 16 Ark., 257; Du Val et al. v. Marshall, 30 Ark., 230; Williamson v. Furbush, 31 Ark., 539.*

In the last case the facts were, in some respects, analogous to the facts of this case.

Mills and the plaintiff were citizens of Tennessee. Mills died in Tennessee, and left a will, which was probated. Caledonia Mills, his widow, was his executrix and sole devisee. The personal property was more than sufficient to pay his debts; the plaintiff had a note against the estate which was never presented for allowance or payment in Tennessee; there was no administration on Mills' estate in Arkansas, and the claim never was allowed here.

A bill was filed in equity to enforce the claim against certain real estate in Arkansas, alleged to be subject to the payment of the debt.

Mr. JUSTICE WALKER, who delivered the opinion of the

court, in discussing the question of the liability of the real estate in Arkansas in such a proceeding, after intimating distinctly that the claimant ought to have presented his demand to the administrator in Tennessee for allowance, goes on to say: "It will be seen, too, that this is a foreign debt; one contracted at the testator's domicile, in which administration had been granted, and it is questionable whether, if ancillary administration was had in Arkansas, a foreign claim could be presented here and the assets of the estate exhausted to pay it, to the prejudice of the rights of creditors in Arkansas."

The court further said: "The plaintiff says that the personal estate in Tennessee is amply sufficient to pay his debts, and if such is the case, there is no apparent reason why he should not enforce his claim there. But suppose such was not the case; that there were many claimants whose debts greatly exceeded the assets in Tennessee, and that in Arkansas there was an estate largely more than necessary to pay the debts here, and, upon settlement, there was a balance on hand; it would certainly not be equitable to allow one creditor to bring his claim to Arkansas and take full satisfaction of his debt, leaving the debts of the other creditors unpaid, or but partially paid."

We have given this question anxious consideration, and devoted a good deal of time to its investigation. We find the decisions on the subject conflicting, and often unsatisfactory. But while it is impossible to reconcile those conflicting decisions, we think, according to the weight of authority, to which we yield our assent, the claim of Brennan & Co. ought to have been allowed, if allowed at all, by the administrator of the domicile, and that its allowance by the ancillary administrator in Arkansas was wholly unauthorized.

Independently of the want of authority in the ancillary administrator to allow the claim, viewed in another aspect, the circumstances attending its presentation and allowance in Arkansas are well calculated to throw suspicion upon the motives of the principal actors in the transaction.

Previous to Perkins' death, he had been sued in one of the Tennessee courts for the recovery of this claim, and soon afterwards the widow (administratrix) compromised the suit for $2,000, to which she added $100 for attorney's fees, making in all $2,100, which she claims to have been paid out of her own money. The Tennessee estate consisted largely of personal property, and by the law of that state the widow was entitled to this absolutely, subject only to the payment of the debts of the deceased.

If, then, the widow, as is alleged, paid the claim out of her own money, she being entitled to the whole of the personal estate, subject only to the payment of debts, it was in effect, repaid to her from the personal assets in her hands, which was thereby relieved from further liability on that account.

It seems quite evident that the claim was sent to Arkansas for payment, in the first instance, to relieve the personal property in Tennessee from a liability which originally attached to it, and impose a corresponding burden upon the real estate in Arkansas, to which the plaintiffs, as heirs at law of Constantine Perkins, were entitled, subject only to the dower interest of the widow.

To compel the heirs to pay this claim out of the real estate in Arkansas, which has already, in effect, been paid out of the personal estate in Tennessee, would be unfair and unjust to them, and equivalent to a second payment of the same debt, to their prejudice and for the special benefit of the widow.

Pennington, who seems throughout the whole business to have acted in counsel with Mrs. Perkins, must have fully comprehended the character of the claim, and the purposes for which it was sent to Arkansas for allowance. As we regard it, looking at the matter in the light of the facts and circumstances attending the allowance of the claim here, its fraudulent character is evident; and we agree with the chancellor in his decree, that said claim be wholly set aside and rejected, because of fraud in its allowance.

4. As to the validity of the John Rowland claim.

The reasons which, in our judgment, warrant the rejection of the Brennan & Co. claim apply, with nearly if not equal force, to the Rowland claim. This, too, was a Tennessee debt  Rowland lived with the deceased, and continued to reside with the widow after Perkins' death. The claim is said to have been for services rendered Perkins in his lifetime. If a legitimate claim, it ought to have been allowed and paid in ·Tennessee. *There* was the bulk of personal assets out of which the debts, especially the home debts, were to be paid. Why, then, was the Tennessee administration ignored and the claim sent out to the Arkansas administration for allowance? We may reasonably suppose that it was sent here, as in the case of the Brennan & Co. claim, to relieve the personal property in Tennessee from a liability primarily resting upon it, and impose such liability as a burden upon the real property in Arkansas, to the prejudice of the plaintiffs. That an understanding was had between the widow, Pennington and Rowland to this effect, hardly admits of a doubt. Indeed all the circumstances lead to this conclusion. The fact that the claim was first presented and allowed in Arkansas, where, as we hold, the ancillary administration

had no authority to allow it, was, in connection with other attending circumstances, strong presumption of the fraudulent character of the claim. It ought to have been rejected.

Upon review of this cause, we are of opinion that there is error in so much of the chancellor's decree as decides that the claim of John Rowland is a valid and binding claim against the estate of Constantine Perkins; and to this extent the decree is reversed, but in all other respects affirmed.

HARRISON, J.—Dissenting. I am unable to concur in the conclusion reached in the opinion of the court, that no other creditors but those residing in this state were entitled to prove their claims in the administration here.

For such a distinction there is in my mind no well-grounded or satisfactory reason.

Though an ancillary administration is, as it is said, subservient to the rights of creditors, legatees and distributees who are residents within the state or county where it is granted, the rights of all are to be regarded; their protection is not the primary object of such administration.

During his lifetime, the law gives no preference to the debtor's creditors residing within the state, and all may alike sue him in the courts. Why may not all also, upon his death, sue his administrators or prove their claims against his estate? All creditors may prove their claims in the domiciliary administration, and it is against every principle of equity and justice that the local creditors, or those within the jurisdiction of the ancillary administration, who have equal right in the assets of the former, should exclude the foreign creditors from any participation with them in those of the latter.

All that the local creditors may in justice demand, as I understand the rule to be, is that the effects of their deceased debtor shall not be withdrawn from the state until they are paid, if the estate is solvent; or, if insolvent, they have received a *pro rata* of their claims, according to the law of their state, in the aggregate assets of both the domiciliary and ancillary administrations.

Chief Justice Parker, in *Goodall v. Marshall, 11 N. H., 94,* said: "As the movable property must be administered according to the *lex loci rei sitæ* until it comes to the disposition of the balance in the hands of the administrator, is there any sound reason why a distinction should be made between creditors, citizens of that place, and those who reside in other governments? or, in other words, shall the government which administers the property within its jurisdiction, and causes that administration to enure for the benefit of its own citizens, exclude the citizens of other states from a participation in it by refusing to entertain their claims?

"The first answer to this question may be drawn from a consideration of the state of the laws relating to the remedies of the creditors preceding the death of their debtor. It would, perhaps, be too much to say, that there is no nation, possessing just claims to be regarded as a civilized government, in which, during a time of peace and friendly relations, the subjects or citizens of a foreign state are excluded from pursuing similar remedies for the collection of debts provided for its own subjects. It is sufficient that no such exclusion is known to the common law, nor to the statutes of England, or those of the several United States. So far as regards the relations of the latter to each other, any attempt at such exclusion is prohibited by the clause of the Constitution of the United States, which provides

that the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states. If the creditors of the domicile may pursue the property of the debtor in his lifetime, in another government, equally with the citizens of the government where the property is situated, no sound reason suggests itself why they should be debarred of a remedy, and the property be appropriated exclusively, or in the first place to the satisfaction of the creditors in the latter government on his decease. Even if by permitting them to come in, the property may be insufficient to pay all, and the creditors in the government where the property is situated thereby compelled to resort to the principal administration where the debtor had his domicile, or to lose their debts, or a portion of them; this result is no other than might have been obtained in the lifetime of the debtor, by his withdrawal of the property from their jurisdiction.

"Another answer, and one which seems entitled to weight, is furnished by the considerations to which we have before adverted, showing that the ancillary administration, so far as creditors are concerned, is to be governed by the *lex loci*. If no regard is had to the place of residence of the deceased, in the marshaling of the assets, and the payment of the debts, no good reason occurs to us why any regard should be had to the place of residence of the creditors, in the allowance of the claims."

And all the cases I have been able to find, in which the question has been directly passed upon, or adverted to, except the one hereafter mentioned, are in agreement with the case from which I have quoted. *Dawes v. Head, 3 Pick., 144; Davis v. Estes, 8 Pick., 475; Harvey v. Richards, 1 Mason, 381; Cummings v. Banks, 2 Barb., 607; DeSobry v. DeLaister, 2 Harris & J., 244; Rosenthal v. Renick, 44 Ill., 202.*

I find no direct expression in Kent's Commentaries upon the point in controversy. The passage referred to in the opinion, if not indicating a contrary view, certainly does not admit of a construction favorable to that taken by the majority of the court. The author, after saying, "whether the court here ought to decree distribution, or remit the property abroad, was matter of judicial discretion, and there was no universal or uniform rule on the subject," proceeds as follows:

"The manner and extent of the execution of the rule were well discussed and considered in the supreme court of Massachusetts. A person was domiciled at Calcutta, and died there insolvent, and his will was proved and acted upon there. Administration was taken out in Massachusetts, on the probate of the will in the East Indies; and assets came to the hands of the administrator at Boston, sufficient to pay a claim due citizens of the United States, and a judgment debt due a British subject in England; but all of the assets were wanted to be applied, in the course of administration, by the executor at Calcutta. It was held that the administrator here was only ancillary to the executor in India; and the assets ought to be remitted, unless he was compelled by law to appropriate them here to pay debts. It was not decided whether he was compelled to pay here; but if it were the case, it would only be the American creditors; and the British creditor was not entitled to come here and disturb the legal course of settlement of the estate in his own country. If there were no legal claimants with us in the character of creditors, legatees, or next of kin, the administrator would be bound to remit the assets to the foreign executor, to be by him administered according to the law of the testator's domicile; and if any part of the assets were to be retained, it

would form an exception to the general rule, growing out of the duty of every government to protect its own citizens in recovery of their debts. The intimation has been strong that such an auxiliary administration, in the case of a solvent estate, was bound to apply the assets found here to pay debts due here; and that it would be a useless and unreasonable courtesy to send the assets abroad, and the resident claimant after them. But if the estate was insolvent, the question became more difficult. The assets ought not to be sequestered for the exclusive benefit of our own citizens. In all civilized countries, foreigners, in such a case, are entitled to prove their debts and share in the distribution. The court concluded that the proper course, in such a case, would be to retain the funds; cause them to be distributed *pro rata*, according to our own laws, among our own citizens, *having regard to all assets and the whole aggregate amount of debt here and abroad*, and then to remit the surplus abroad to the principal administrator. Such a course was admitted to be attended with delay and difficulty in the adjustment; but it was thought to be less objectionable than either to send our citizens abroad upon a forlorn hope to seek for payments of an insolvent's estate, or to pay them the whole of their debts, without regard to the claims of foreign creditors." *2 Kent's Com., 433, 434.*

The case alluded to in the above extract is *Dawes v. Head, 3 Pick., 128,* which was a suit upon the administrator's bond, for failing to pay the claims mentioned, and the court, in the course of the opinion, say:

" Whether citizens of other states claiming payment of their debts of the administration here, are to be put upon the same footing with citizens of Massachusetts, by virtue of the privileges and immunities secured to them by the constitution of the United States, is a point which we do

not now decide. But, without doubt, the courts of the United States, having full equity powers, would enforce payment upon the principles above stated, where there is no suggestion of insolvency of the estate. There would be no doubt, we think, that the payment of debts by the administrator here, after sufficient proof that they were due, and an allowance of his account therefor by the probate court, with proper notice, would be faithful administration, according to the condition of his bond, and would be a proper way of accounting to the principal administrator abroad.

"In regard to effects thus collected within our jurisdiction, belonging to an insolvent estate of a deceased person having his domicile abroad, the question may be more difficult. We can not think, however, that in any civilized country, advantage ought to be taken of the accidental circumstances of property being found within its territory, which may be reduced to possession by the aid of its courts and laws, to sequester the whole for the use of its own subjects, or citizens, where it shall be known that all the estate and effects of the deceased are insufficient to pay his just debts. Such a doctrine would be derogatory to the character of any government. Under the English bankrupt system, foreigners, as well as subjects, may prove their debts, and share in the distribution. Without doubt, in other foreign countries, where there is a *cessio bonorum*, or other process relating to bankrupts' estates, the same just principle is adopted. It was so under our bankrupt law while that was in force, and no reason can be suggested why so honest a principle should not be applied in the case of insolvent estates of deceased persons. It is always practiced upon in regard to persons dying within our jurisdiction, having had their domicile here; that is, creditors of all countries have the same right

as our own citizens to file their claims and share in the distribution. There can not be, then, a right in any one or more of our citizens, who may happen to be creditors, to seize the whole of the effects which may be found here, or claim an appropriation of them to the payment of their debts, in exclusion of foreign creditors."

The precise question here is not considered, nor even stated, in. *Story's Conflict of Laws*, and there is to be found in it no intimation of opinion as to it, except such as may be presumed from a very copious extract from the case of *Dawes v. Head, in a note to sec. 513.*

I have not been able to see the case of *Barry's appeal;* of the others cited, *Hunt v. Fay, 7 Vermont, 170*, is the only one directly in point, or which, indeed, has any material bearing, and the decision in that case was by a divided court, Justice Mattock dissenting. *Mothland v. Wiseman, 3 Penn., 185,* is an authority the other way. The court in that case say : " But that the effects are to be collected and administered by local authority, is a principle, not only of British, but of American law. In *Topham v. Chapman, 3 Rep. Const. Court, S. C., 283*, it was much debated whether they should not also be distributed by the same authority, though according to the law of the domicile; but that the collection and payment of the debts might be by any other authority, was never supposed. The same question was debated in *Harvey v. Richards, 1 Mason, 485;* and in *Dawes v. Head, 3 Pickering, 128*, it was held that an administrator here, though admitted to be but auxiliary to the administrator at the place where the decedent was domiciled, is bound to remit the assets to be administered there, only in case there are no domestic claimants in the character of creditors, legatees or next of kin; but that when these appear, the assets are to be retained for administration,

according to our own laws, *permitting the foreign creditors to participate in proportion to their debts, respect being had to the aggregate of the estate and of the debts, whether foreign or domestic.*

The authorities, it is thus seen, almost without an exception, sustain the doctrine for which I have contended.